UNITED STATES of America,
Appellee,

v.

Jose CASSIAGNOL, Appellant.

UNITED STATES of America,
Appellee,

v.

Bruce W. GRANT, Appellant.

UNITED STATES of America,
Appellee,

v.

Emily FRANCO (Jane Doe), Appellant.

UNITED STATES of America,
Appellee,

v.

Hampton P. HOWELL, Appellant.

UNITED STATES of America,
Appellee,

v.

Norman MAILER, Appellant.

UNITED STATES of America,
Appellee,

v.

Peter KIGER, Appellant.

UNITED STATES of America,
Appellee,

v.

Jerry RUBIN, Appellant.

Nos. 12063–12065, 12086, 12252,
12659 and 12660.

United States Court of Appeals
Fourth Circuit.

Jan. 8, 1970.
Certiorari Denied April 20, 1970.
See 90 S.Ct. 1364.

Philip J. Hirschkop and Lawrence E. Freedman, Alexandria, Va. (Joseph Forer, Washington, D. C., on brief) for appellants.

Theodore George Gilinsky, Atty., Dept. of Justice (Fred M. Vinson, Jr., Asst. Atty. Gen., Beatrice Rosenberg and Paul C. Summitt, Attys., Dept. of Justice, and C. Vernon Spratley, Jr., U. S. Atty., on brief) for appellee.

Before HAYNSWORTH, Chief Judge, and BOREMAN and BUTZNER, Circuit Judges.

BOREMAN, Circuit Judge:

These seven appellants were arrested for alleged offenses arising out of and in the course of an antiwar demonstration at the Pentagon in Arlington County, Virginia, on the weekend of October 21–22, 1967.

Upon request of the project director of the National Mobilization Committee to End the War in Vietnam for all permits necessary to conduct a massive antiwar demonstration on the weekend of October 21–22, 1967, the regional administrator of the General Services Administration (hereinafter called GSA) arranged for a permit to be issued on October 19, 1967, by the National Park Service, the GSA, the Metropolitan Police Department of the District of Columbia and Arlington County. Under the permit, the demonstration was to begin with an assembly and rally at the Lincoln Memorial on the morning of Saturday, October 21. In the early afternoon, the demonstrators were to march to the North Parking Area of the Pentagon for another rally to begin about 3:00 p. m. and last no more than two hours. Further protest activities, to be terminated not later than midnight on Sunday, October 22, were limited to the "Post-North Parking Rally Activity Area," which was described in the permit as:

"An area within the Pentagon Reservation, to be designated by clear lines erected in advance, bounded roughly by the grassy triangular-shaped area north of the Mall Entrance, including a small portion of the North Parking Area where a sanitary van may be located, with the southernmost boundary being the sidewalk at the north perimeter of the paved Mall Entrance Parking Area at the top of the steps."

GSA Rules and Regulations Governing Public Buildings and Grounds under the charge and control of GSA promulgated pursuant to 40 U.S.C. § 318 [1] were posted in all main entrances of the Pentagon and in the lots throughout the

---

1. The full text of 40 U.S.C. §. 318 later appears in this opinion in the discussion of the statute's constitutionality.

Pentagon grounds, including the North and South parking areas. The posted GSA regulations included a provision which prohibited, among other things, "unwarranted loitering * * * or assembly" and "unseemly or disorderly conduct on property." [2]

Beginning some thirty minutes before the permit was due to expire (expiration occurred at midnight, October 22), the following announcement was repeatedly made to the demonstrators by public address system:

"Attention all demonstrators:

"The demonstration in which you are participating ends at midnight. The two-day permit which was agreed to by the leaders of the demonstration and the General Services Administration expires at that time.

"All demonstrators must depart from the Pentagon grounds by midnight. All persons who wish to leave voluntarily can board buses on the mall. These buses will *go to the Memorial Bridge.* Those who wish to take the buses should move to the West end of the sidewalk. Those demonstrators who do not leave voluntarily by midnight will be arrested and taken to a federal detention center.

"All demonstrators are urged to abide by the permit."

While some 34 demonstrators accepted the offer of transportation back to the District of Columbia, about 245 elected to remain in the area in violation of the permit. Prisoner vans were brought into place and arrests commenced shortly after midnight.

Four appellants—Kiger, Howell, Franco and Rubin—were charged with and convicted of offenses relating to their refusal to leave the Pentagon grounds upon the expiration of the permit. Kiger was tried before the United States Commissioner on November 3, 1967, convicted of "unseemly and disorderly conduct,"

and sentenced to thirty days in jail. The district court affirmed on appeal. Howell, Franco and Rubin were convicted of "loitering and assembling in an unwarranted manner." Howell was tried by the district court *without a jury* on November 10, 1967, found guilty, and sentenced to thirty days in jail and fined fifty dollars. Franco was tried in the district court *with a jury* on December 6, 1967, found guilty, and sentenced to thirty days in jail. Rubin was tried by the United States Commissioner on March 6, 1968, found guilty, and sentenced to thirty days in jail. The district court affirmed Rubin's conviction on appeal.

The other three appellants—Cassiagnol, Grant and Mailer—were convicted of "unseemly and disorderly conduct" during the time of the demonstration in crossing over and through an established line of United States marshals into a restricted area and then refusing to remove themselves from such area when ordered to do so. Mailer entered a plea of nolo contendere before the United States Commissioner on October 22, 1967, was found guilty and fined fifty dollars and sentenced to thirty days in jail (with 25 days suspended). The district court affirmed Mailer's conviction, indicating that Mailer could withdraw his nolo contendere plea and have a trial de novo in the district court if he so desired, but the plea was not withdrawn. Cassiagnol and Grant were simultaneously tried on November 9, 1967, in the district court (Cassiagnol by jury and Grant by the court). Each was found guilty and sentenced to twenty days in jail.

Due to the fact that all seven appellants contest the constitutionality of the GSA regulation and the statute which delegates authority to the Administrator of the General Services Administration to promulgate all "needful rules and regulations" for the management of all government property under the charge and control of GSA, these cases were consolidated for appeal.

2. The full text of the GSA regulation later appears in this opinion in the discussion of its constitutionality.

Appellants present three issues for review by this court: (1) Is the GSA regulation under which appellants were convicted unconstitutional due to vagueness or overbreadth; (2) Is the statute delegating authority to the Administrator of GSA to promulgate such regulations an unconstitutional delegation of legislative authority; and (3) Were the appellants deprived of a fair trial and thereby due process of law due to prejudgment of the cases and hostile and prejudicial conduct of the trial judge.

■ Appellants make a two-pronged attack upon the GSA regulation prohibiting "unwarranted loitering * * * or assembly" and "unseemly or disorderly conduct" while on government property.[3] They contend: that the regulation is unconstitutional because it is so vague that it fails to give men of common intelligence fair notice that their contemplated conduct is forbidden; and, that the language is so broad that it acts as an impermissible restraint upon First Amendment freedoms. We reject these contentions.

Adopting the principle that one should not be punished for conduct which he could not have reasonably understood to be criminal, the Supreme Court has consistently held that a penal statute cannot be so vague as to fail to apprise one of normal intelligence that contemplated conduct is violative of statute. United States v. Harriss, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954); Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939).

In *Harriss, supra*, 347 U.S. at 617, 74 S.Ct. at 812, the Court said:

"The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute."

Similarly, in *Lanzetta, supra*, 306 U.S. at 453, 59 S.Ct. at 619, the Court declared:

"* * * [A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."

■ Nor can a statute be so overly broad as to improperly prohibit the enjoyment of constitutional rights. Thus, as was held by the Supreme Court in Winters v. New York, 333 U.S. 507, 509, 68 S.Ct. 665, 667, 92 L.Ed. 840 (1948):

"It is settled that a statute so vague and indefinite, in form and as interpreted, as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech is void, on its face, as contrary to the Fourteenth Amendment."

In N. A. A. C. P. v. Button, 371 U.S. 415, 432–433, 83 S.Ct. 328, 338, 9 L.Ed. 2d 405 (1963), the Court declared:

"The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon an unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application."

Some cases have held disorderly conduct statutes constitutionally defective even though their breadth had been narrowed by construction on the part of the state court. Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed.

3. The regulation here attacked, 41 C.F.R. § 101–19.304, reads as follows:
 "Nuisances. The use of loud, abusive, or otherwise improper language, *unwarranted loitering*, sleeping *or assembly*, the creation of any hazard to persons or things, improper disposal of rubbish, spitting, prurient prying, the commission of any obscene or indecent act, *or any other unseemly or disorderly conduct* on property, throwing articles of any kind from a building and climbing upon any part of a building, is prohibited." (Emphasis added.)

1131 (1949); Landry v. Daley, 280 F. Supp. 968 (N.D.Ill.1968); Baker v. Bindner, 274 F.Supp. 658, 663 (W.D.Ky. 1967). Similarly, generalized loitering statutes, although limited by state court construction, have been stricken down as void for vagueness. Shuttlesworth v. City of Birmingham, 382 U.S. 87, 86 S. Ct. 211, 15 L.Ed.2d 176 (1965); Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); Baker v. Bindner, 274 F.Supp. 658, 663–664 (W.D. Ky.1967).

■ Thus, the language used in the regulation, "unseemly or disorderly conduct" and "unwarranted loitering * * and assembly," on its face without limiting construction might appear to raise constitutional issues. However, while courts have a duty to interpret legislation in a manner not inconsistent with the demands of the Constitution, they are also to avoid a holding of unconstitutionality if a fair construction of the legislation will so allow. United States v. Harriss, 347 U.S. 612, 618, 74 S.Ct. 808, 98 L.Ed. 989 (1954), supra; Screws v. United States, 325 U.S. 91, 98, 65 S.Ct. 1031, 89 L.Ed. 1495, 162 A.L.R. 1330 (1945). In Harriss, supra, 347 U.S. at 618, 74 S.Ct. at 812, the Court explained:

" * * * [I]f the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague even though marginal cases could be put where doubts might arise. [Citations omitted.] And if this general class of offenses can be made constitutionally definite by a reasonable construction of the statute, this Court is under a duty to give the statute that construction."

Therefore, it becomes the duty of this court to examine the contested GSA regulation to see whether or not a reasonable construction of the statute will result in a finding of constitutionality. In making this examination, the fact that this regulation is applicable to acts and conduct on government property only is highly significant. As was stated in United States v. Akeson, 290 F.Supp. 212, 215 (D.Col.1968), a case in which the court upheld the constitutionality of this same challenged GSA regulation:

"This fact [that the regulation applies only on government property] gives rise to a natural and normal construction of the phrase 'unseemly or disorderly conduct' as prohibiting conduct on federal property which is intended to and does interfere with, delay, or impede the normal and orderly conduct of government business on such federal property. This is not a strained construction of the phrase for the *regulation is clearly concerned with conduct on federal property*, is entitled nuisances *and is obviously meant to ensure the orderly conduct of government business on federal property*. (Emphasis added.)

We deal here with conduct of persons on government property and not on public streets, highways, or parks. The cases cited by appellants struck down as constitutionally deficient generally worded statutes which were operating in an unlimited spectrum, unlimited in their scope and in their application, statutes which could be applied against virtually anyone in accordance with the whims of public officials. Those statutes provided no semblance of notice to a man of common intelligence that any particular conduct was forbidden. That is not the situation in the instant case. The regulation here attacked could be applied only to situations involving government property under the charge and control of GSA and only in conjunction with other rules and regulations pertaining to government property. These rules and regulations, all of which were prominently posted in the area in which the demonstration took place, gave clear notice that certain conduct on government property was prohibited. The regulation in question made it clear that "unseemly and disorderly conduct" and "unwarranted loitering * * * and assembly" on this property were proscribed. It would not require a high degree of intelligence or understanding for one to reasonably

conclude that breaking through a line of United States marshals who were lined up between the demonstrators and the Pentagon, a government building of highly strategic importance to the defense of the United States, could subject him to charges for disorderly conduct or that remaining on government property which was closed to the public during nonbusiness hours (according to the rules and regulations of GSA posted in the demonstration area) beyond the expiration of the demonstration permit could subject him to charges for disorderly conduct or unwarranted loitering and assembly.

These appellants were not charged with participation in the demonstration or expressing opposition to government policies. Instead, they were charged with "unseemly or disorderly conduct" and "unwarranted loitering and assembly" by breaking through lines of United States marshals and by refusing to leave government property after the expiration of the demonstration permit. If appellants did commit the acts with which they were charged we conclude that their claim that they were deprived of notice that such actions could subject them to criminal charges is not well founded. Breaking through a line of marshals could subject one to arrest in the absence of a disorderly conduct regulation. As to the charges growing out of the refusal to leave the demonstration area when the permit expired, the record is clear and uncontroverted that numerous warnings were given to the effect that remaining on the premises would subject the demonstrators to arrest and detention. We find no merit in this claim that they were not apprised that their actions would be illegal. *See* United States v. Woodard, 376 F.2d 136, 140 (7 Cir. 1967); United States v. Jones, 365 F.2d 675, 678 (2 Cir. 1966).

■ As to appellants' contention that the regulation is overly broad and therefore violative of First Amendment freedoms, we again point out that the regulation applies only to government property under the charge and control of GSA. The Pentagon, being of peculiar and significant importance to the defense of the United States, could constitutionally be made a totally restricted area and the government could deny any public access to the building or its grounds if it so desired. *See* Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Cafeteria and Restaurant Workers v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Instead of "chilling" First Amendment rights, as appellants claim, GSA actually provided a forum for the demonstration by issuing the permit. In contemplation of normal use of the area as a parking lot for Pentagon employees on early Monday morning, the permit clearly stated that it was to expire at midnight Sunday, October 22. GSA has not only the right, but also the duty, to see that government property under its charge and control is in proper condition for normal usage, so that government business may continue.

■ Appellants contend that, even though this property was owned by the United States government, it was open to the public at all times; that they were entitled to be on this property at any and all times and the demonstration permit was unnecessary; that the demonstrators could not legally be required to leave the property and were not subject to arrest for remaining after the permit expired.

The GSA regulations which were posted in the demonstration area clearly state that: "Except as otherwise ordered, property shall be closed to the public after normal working hours." 41 C.F.R. 101–19.301. While the area in question (the parking area, the entrances of the Pentagon and the area between) may well be open to the public during regular working hours, it certainly is not open to the public during the time in question (i. e., over a weekend). Appellants and the other demonstrators had the right to be in the area in question only by virtue of the permit which extended to them the privilege of being on government property during nonbusiness

hours. The expiration of the permit extinguished that privilege.

 Even where government property is generally open to the public, reasonable nondiscriminatory regulation is appropriate to prevent interference with the designated and intended governmental use thereof. *See* Amalgamated Food Employees v. Logan Valley Plaza, Inc., 391 U.S. 308, 320, 88 S.Ct. 1601, 20 L.Ed. 2d 603 (1968); Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968). The right of peaceful protest does not mean that anyone wishing to express an opinion or belief may do so at *any* time or at *any* place. Cox v. Louisiana, 379 U.S. 559, 574, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). We conclude that the GSA regulation in question is neither vague nor overly broad.

Appellants challenge the constitutionality of 40 U.S.C. § 318 (which is set out in full in the footnote below) [4] which

4. 40 U.S.C. § 318. The Administrator of General Services or officials of the Administration duly authorized by him may appoint uniformed guards of said administration as special policemen without additional compensation for duty in connection with the policing of public buildings and other areas under the jurisdiction of the Administrator of General Services. Such special policemen shall have the same powers as sheriffs and constables upon such Federal property to enforce the laws enacted for the protection of persons and property, and to prevent breaches of the peace, to suppress affrays or unlawful assemblies, and to enforce any rules and regulations made and promulgated by the Administrator or such duly authorized officials of the Administration for the property under their jurisdiction: *Provided*, That the jurisdiction and policing powers of such special policemen shall not extend to the service of civil process and shall be restricted to Federal property over which the United States has acquired exclusive or concurrent criminal jurisdiction.

§ 318a. The Administrator of General Services or officials of the General Services Administration duly authorized by him are authorized to make all needful rules and regulations for the government of the Federal property under their charge and control, and to annex to such rules and regulations such reasonable penalties, within the limits prescribed in section 318c of this title, as will insure their enforcement: *Provided*, That such rules and regulations shall be posted and kept posted in a conspicuous place on such Federal property.

§ 318b. Upon the application of the head of any department or agency of the United States having property of the United States under its administration and control and over which the United States has acquired exclusive or concurrent criminal jurisdiction, the Administrator of General Services or officials of the Administration duly authorized by him are authorized to detail any such special policemen for the protection of such property and if he deems it desirable, to extend to such property the applicability of any such regulations and to enforce the same as set forth in sections 318–318c of this title; and the Administrator of General Services or official of the Administration duly authorized by him, whenever it is deemed economical and in the public interest, may utilize the facilities and services of existing Federal law-enforcement agencies, and, with the consent of any State or local agency, the facilities and services of such State or local law-enforcement agencies.

§ 318c. Whoever shall violate any rule or regulation promulgated pursuant to section 318a of this title shall be fined not more [than] $50 or imprisoned not more than thirty days, or both.

§ 318d. Officials or employees of the General Services Administration who have been duly authorized to perform investigative functions may be empowered by the Administrator of General Services, or officials of General Services Administration duly authorized by him, to act as nonuniformed special policemen in order to protect property under the charge and control of the General Services Administration and to carry firearms, whether on Federal property or in travel status. Such officials or employees who are empowered to act as nonuniformed special policemen shall have, while on real property under the charge and control of the General Services Administration, the power to enforce Federal laws for the protection of persons and property and the power to enforce rules and regulations made and published for such purposes by the Administrator or duly authorized officials of the General Services Administration. Any such special policeman may make arrests without warrant for any offense committed upon such property if he has reasonable ground to believe (1) the offense constitutes a

delegates authority to the GSA Administrator to promulgate regulations concerning property of the United States Government under the charge and control of GSA. Appellants allege that the broad grant of authority to GSA exceeds the permissible right of Congress to delegate its own authority.

In Marshall Field & Co. v. Clark, 143 U.S. 649, 694, 12 S.Ct. 495, 505, 36 L.Ed. 294 (1892), the Supreme Court, quoting from Locke's Appeal, 72 Pa. 491, 498, said:

" 'The legislature cannot delegate its power to make law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. * *.' "

Appellants do not urge that Congress may not formulate a policy, legislate for the implementation of that policy, and then delegate to an appropriate agency the authority to make administrative rulings consistent with the standards and purposes set out in the statutory mandate. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944); United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911). But appellants cite cases, Schechter Poultry Corp v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947 (1935); Panama Refining Co. v. Ryan, 293 U.S. 388, 5 S.Ct. 241, 79 L.Ed. 446 (1935), for the proposition that if the grant of power is not to constitute an unconstitutional delegation of legislative power, it must be structured so that the discretion of the federal agency is circumscribed by clearly enunciated standards. Appellants' argument is not persuasive because *Panama Refining* and *Schechter* involved virtually unlimited delegations of authority and also concerned interests in private property.

In the instant case, we are dealing with government property, and the delegation of authority is much more limited. The limits are set out in the statute, as GSA is to have authority to establish regulations only as to government property under its charge and control. It is clear that Congress has constitutional power [5] to "make all needful Rules and Regulations" concerning government property. Under such constitutional authority Congress delegated the authority to make regulations governing the operation, maintenance and use of government property to the GSA Administrator. Such authority necessarily had to be somewhat general in nature due to the vast number and great variety of properties entrusted to the charge and control of GSA, but this authority, contrary to appellants' contention, was not unlimited. GSA was given physical control and custody of a wide variety of public buildings in and out of the District of Columbia, including courthouses, customhouses, barge offices and office buildings.[6] The function exercised in relation to such property is essentially one of maintaining, operating and protecting buildings and grounds for the uses for which they have been designated.[7] Congress fixes the governmental purpose of a particular piece of property and limits the GSA Administrator's power to make "needful rules and regulations" to maintain and protect such property and ensure its use for the authorized purpose.[8] To require Congress specifically to enumerate GSA's duties would be to require the impractical, if not the impossible. Similar grants of general regulatory and administrative authority are common, *e. g.*, national parks, national military parks and battlefields, national forests, watersheds, etc.[9] It is reasonable and constitutional to delegate to the agency charged with maintenance and protection of government

---

felony under the laws of the United States, and (2) that the person to be arrested is guilty of that offense.

5. Article 4, § 3, United States Constitution.

6. *See* 40 U.S.C. §§ 285, 490.

7. *See* 40 U.S.C. § 490.

8. *See* 40 U.S.C. § 318a.

9. *See* 16 U.S.C. §§ 3, 9a, 551, 552b.

property the right to fix the hours and places where the property may be entered by the public, as well as minimum acceptable conduct thereon, and to provide for the punishment of those violating such regulations. As was stated in United States v. Grimaud, 220 U.S. 506, 521, 31 S.Ct. 480, 484, 55 L.Ed. 563 (1911), *supra,*

" * * * [T]he authority to make administrative rules is not a delegation of legislative power, nor are such rules raised * * * to a legislative character because the violation thereof is punished as a public offense."

We find 40 U.S.C. § 318 to be a constitutional delegation of administrative authority to the Administrator of GSA to promulgate "needful rules and regulations" pertaining to government property under the charge and control of GSA.

■ The third and final issue is raised by appellants' contention that they were deprived of a fair trial and thereby due process of law by prejudgment and prejudicial conduct on the part of the trial judge. As to appellants Kiger, Mailer and Rubin, who were tried before a United States Commissioner and who were before the district court only for review of the Commissioner's decision, the record does not support their contention.[10]

As to the other four appellants, Franco and Cassiagnol were tried in the district court with juries, while Howell and Grant were tried by the district court without juries. These appellants contend that the trial judge's prejudgment and prejudicial conduct was manifested by his hostile attitude toward them, by the argumentative manner in which he pursued extended cross-examination of these appellants and by his general conduct which was described by them as "assuming the role of prosecuting attorney."

■ First, we consider the actions of the trial judge in the joint trial of Cassiagnol (by jury) and Grant (by the court). The challenged questioning was directed by the judge to Cassiagnol after he had described on redirect examination the events surrounding his arrest. There was a substantial appearance of inconsistency, confusion and uncertainty during the trial as to whether Cassiagnol had crossed the line of marshals or whether the line of marshals had passed over him as he was sitting down with his back to the line. The court interrupted with numerous questions concerning the circumstances at the time of the arrest during the testimony of both Cassiagnol and a government witness. Although the judge's questioning was sometimes sharp and perhaps was more extensive than was necessary we do not believe it was fatally prejudicial to Cassiagnol. The obvious purpose of the questioning was to clear up a confusing factual situation and the triers of fact (the jury in Cassiagnol's case and the court in Grant's case) were entitled to information necessary to a correct determination of the facts. Especially in situations where the evidence is in conflict it is proper for a judge to ask questions designed to bring before the jury the facts and circumstances pertinent to the alleged offense. United States v. Chase, 372 F.2d 453, 462 (4 Cir. 1967), cert. denied, 387 U.S. 907, 87 S.Ct. 1688, 18 L.Ed.2d 626 (1967); Fields v. United States, 370 F.2d 836, 839 (4 Cir. 1967); United States v. Godel, 361 F.2d 21, 24 (4 Cir. 1966); Simon v. United States, 123 F.2d 80, 83 (4 Cir. 1941), cert. denied, 314 U.S. 694, 62 S.Ct. 412, 86 L.Ed. 555 (1941).

■ The challenged questioning in this joint trial was not prejudicial to Grant because it related only to the circumstances incident to Cassiagnol's arrest and the time of said arrest rather than to the arrest of Grant. In our

---

10. There is an additional issue before this court concerning the disposition of appellant Rubin's appeal, which involves a question of electronic eavesdropping. This issue is discussed and treated near the close of this opinion.

opinion, in neither of these cases was the questioning so hostile as to indicate prejudgment of guilt by the court. In a nonjury case active interrogation by the court is not always prejudicial. Jackson v. United States, 117 U.S.App.D.C. 325, 329 F.2d 893, 894 (1964). We find no merit in the contention that either Cassiagnol or Grant was denied a fair trial by prejudgment or prejudicial conduct on the part of the judge.

We turn to a consideration of Howell's trial by the court without a jury. Throughout, the judge exhaustively interrogated Howell, in one instance covering thirteen consecutive pages of trial transcript (with the exception of defense counsel's attempt to ask his client one question which was cut off by the judge). The judge lectured and chided Howell, asked time and again why "an honor student at Harvard University" would participate in events which had occurred at the demonstration, referred to provocative incidents which had occurred during the demonstration but which were not the subject of charges brought against Howell, and at several points during Howell's testimony gave every indication that he had already decided the case adversely to Howell. These occurrences were prior to the completion of defendant's testimony and prior to completion of his case.

██ One of the most fundamental rights of an accused is the right to a fair trial by an impartial tribunal. Even though interrogation by a trial court is not always prejudicial in a case tried by the court, Jackson v. United States, 117 U.S.App.D.C. 325, 329 F.2d 893, 894 (1964), *supra,* a conviction should be reversed when the appellate court is satisfied from the record that the trial judge prejudged the case before hearing all the evidence. *See* Rosenberg v. Baum, 153 F.2d 10, 16 (10 Cir. 1946). Here the record is replete with evidence that the judge had predetermined Howell's guilt before the case was fully presented. We reach the conclusion that Howell's conviction should be reversed and the case remanded for a new trial.

██ Next, we consider the allegation of prejudicial conduct on the part of the judge during the jury trial of appellant Franco. It is urged that the judge continually questioned Miss Franco in a hostile manner, described as "assuming the role of prosecuting attorney," that the judge attempted to coerce Franco into giving specific answers which the court wanted, and that the judge frequently interrupted defense counsel's closing argument, thereby contaminating the impartial atmosphere of the trial and prejudicing the jury to the extent that appellant Franco was denied a fair trial and due process of law.

An examination of the trial transcript supports these allegations. The judge continually interrupted the direct examination of Miss Franco with sharp, chiding remarks and repeated questions, seemingly seeking specific answers rather than accepting the answers which had been given. The judge interrupted defense counsel's summation on numerous occasions, using chiding, critical language.

██ The law is well settled that the behavior and bearing of a judge during a jury trial must be such that the entire trial will be conducted in a general atmosphere of impartiality. United States v. Ornstein, 355 F.2d 222 (6 Cir. 1966); Young v. United States, 120 U.S.App. D.C. 312, 346 F.2d 793 (1965); United States v. Carmel, 267 F.2d 345 (7 Cir. 1959); United States v. Levi, 177 F.2d 833 (7 Cir. 1949). As the court stated in Blumberg v. United States, 222 F.2d 496, 501 (5 Cir. 1955):

" * * * [I]t is far better for the trial judge to err on the side of obstention [sic] from intervention in the case rather than on the side of active participation in it, especially when the major part, if not all of his interruptions and interventions, though by chance rather than by design, are, or seem to be, on, or tending to be on, the side of the government."

As this court stated in Pollard v. Fennell, 400 F.2d 421, 424 (4 Cir. 1968):

"As the only disinterested lawyer whose only interest is to see that justice is done, and especially as one who, in the eyes of the jury, occupies a position of preeminence and special persuasiveness, the district judge must be assiduous in performing his function as governor of the trial dispassionately, fairly and impartially."

*Pollard* involved civil litigation, but the judge's duty to remain impartial must necessarily exist to the same degree, at least, in a criminal proceeding where human liberty is at stake.

Appellants admit and this court certainly agrees that a presiding judge has some discretion in the examination of witnesses. In fact, we have said earlier in this opinion that the judge is entitled to propound questions pertinent to a confused factual issue which requires clarification. He may also intercede because of seeming inadequacy of examination or cross-examination by counsel, or to draw more information from reluctant witnesses or experts who are inarticulate or less than candid. Jackson v. United States, 117 U.S.App.D.C. 325, 329 F.2d 893, 894 (1964), *supra*. But this privilege or duty is subject to reasonable limitations. The assumption by the judge of the burden of cross-examination of the accused in a criminal case by extensive interrogation may be reversible error. Jackson v. United States, *supra;* United States v. Carmel, 267 F.2d 345 (7 Cir. 1959), *supra.*

In *Pollard*, 400 F.2d 421, *supra* at 424, this court quoted from Groce v. Seder, 267 F.2d 352, 355 (3 Cir. 1959):

"Where both sides are represented by eminently competent counsel we think it important that the court minimize its own questioning of witnesses, to the end that any such judicial departure from the normal course of trial be merely helpful in clarifying the testimony rather than prejudicial in tending to impose upon the jury what the judge seems to think about the evidence."

Constant or persistent interruption of defense counsel may have the effect of contaminating the jury's verdict by indicating the judge's evaluation of the weight of the evidence and the merits of the defense. Young v. United States, 120 U.S.App.D.C. 312, 346 F.2d 793 (1965). This is not to say that the judge cannot correct an erroneous statement made by a defendant's counsel or that the judge cannot instruct the jury to ignore an improper comment made by counsel, but it is incumbent on the judge to conduct himself impartially and without the obvious indication of continual agitation and hostility toward counsel for either side.

The judge's exhaustive questioning of appellant Franco, often in a chiding, seemingly hostile manner and often indicating that the judge was *suggesting* or *seeking* a specific answer other than the one which had been given, coupled with the judge's persistent and repeated interruptions of defense counsel during the trial and during counsel's summation with sharp, critical comments, undoubtedly tended to prejudice this defendant before the jury and deprive her of a fair trial. We conclude that the conviction of Franco must be reversed and her case remanded for a new trial.[11]

Finally, we further consider the disposition of Rubin's appeal. The Gov-

11. In considering the Howell and Franco cases we are not unmindful of the fact that they were among a number of cases growing out of the demonstrations at and near the Pentagon. From the records of several similar trials it is obvious that the defense attorneys persisted in ranging far afield with full knowledge of the repeated rulings of this same district court in case after case. Whatever may have been the objective of defendants and their counsel, whether to obtain maximum notoriety through sensational coverage by the news media or to create political capital for the cause which the defendants espoused, it is only fair to offer the observation that there was every indication of efforts to con-

ernment tendered to this court a sealed exhibit containing transcripts of conversations in which Rubin participated or during which he was present, conversations which had been overheard by means of electronic surveillance. The Government maintained that Rubin was not the direct subject of this or any other electronic surveillance, that he had been overheard as the result of surveillance of others conducted in the interests of national security, that the contents of the monitored conversations are unrelated to this case, were never used in evidence and did not form the basis of leads to any evidence introduced against him. The Government requested us to examine *in camera* these transcripts and satisfy ourselves that the conversations were irrelevant to this case, the procedure followed in United States v. Battaglia, 394 F.2d 327 (7 Cir. 1968), and Stassi v. United States, 401 F.2d 259 (5 Cir. 1968). However, subsequent to the Government's tender of these transcripts to this court for *in camera* inspection and prior to this decision, the two cases upon which the Government relied were overruled in Giordano v. United States, 394 U.S. 310, 312, 89 S.Ct. 1164, 1165, 22 L.Ed.2d 297 (1969), wherein the Court said:

> "It is not evident from the records in some of these cases whether the surveillances at issue were unlawful. It may be that the overhearings in some instances were not achieved by trespass, see Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969), and Kaiser v. New York, 394 U.S. 280, 89 S.Ct. 1044, 22 L.Ed.2d 274 (1969), or for some reasons were not unlawful. As we held in Alderman v. United States, Ivanov v. United States and Butenko v. United States [all reported at 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)] at 170 n.

3, 'the District Court must develop the relevant facts and decide if the Government's electronic surveillance was unlawful.' Of course, a finding by the District Court that the surveillance was lawful would make disclosure and further proceedings unnecessary. Similarly, it is not clear that each petitioner has standing to assert the illegality of the surveillance or of the introduction of its fruits. As in *Alderman, Ivanov*, and *Butenko*, these issues are to be resolved by the District Courts in the first instance."

We are of the opinion that the judgment against Rubin must be vacated and that his case should be remanded to the district court for resolution of the questions raised by the disclosure of the electronic surveillance in light of the holdings in *Giordano, supra,* and the cases cited therein; namely, Alderman v. United States, Ivanov v. United States, and Butenko v. United States. We emphasize the statement of the Court in *Giordano* to the effect that a finding by the district court that the surveillance was lawful would make disclosure and further proceedings unnecessary. Should the district court so find, the judgment below should be reinstated.

Briefly summarizing, the convictions of Kiger, Mailer, Cassiagnol and Grant are affirmed. The convictions of Howell and Franco are reversed and their cases remanded for new trials. The judgment against Rubin is vacated and the case is remanded to the district court for further proceedings consistent with the views herein expressed.

Affirmed as to Kiger, No. 12659; Mailer, No. 12252; Cassiagnol, No. 12063; and Grant, No. 12064.

Reversed as to Howell, No. 12086, and Franco, No. 12065, and remanded for new trials.

Judgment below as to Rubin, No. 12660, vacated and case remanded for further proceedings.

vert one trial after another into a "three-ring circus" and to try the patience of the most patient. Judges are

only human and it is unfortunate that these obvious efforts were partially successful.