Scott Lewis CRANDELL, Linda Marie Crandell, Jennifer Jammeson Crandell, as infant who sues by her mother and next friend Linda Marie Crandell, Appellants,

v.

UNITED STATES of America, Appellee.

No. 82–1416.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 9, 1982.

Decided March 14, 1983.

William O. Snead, III (Robert T. Hall, Jaclyn Leonhard, James C. Allred, Hall, Surovell, Jackson & Colten, P.C., Fairfax, Va., on brief), for appellants.

Elsie L. Munsell, U.S. Atty., Alexandria, Va., for appellee.

Before HALL, MURNAGHAN and SPROUSE, Circuit Judges.

SPROUSE, Circuit Judge:

Scott and Linda Crandell, and their infant daughter, Jennifer Crandell, ("the Crandells"), appeal from a judgment the district court entered following a bench trial, dismissing their medical malpractice suit against the United States. The Crandells alleged that medical personnel at Quantico Naval Hospital failed to provide medical care to Jennifer in accordance with generally accepted standards of medical care, resulting in permanent injuries to Jennifer.

On June 26, 1977, seven-month-old Jennifer, just recovering from a cold, suffered a convulsion and immediately was taken to Quantico Naval Hospital. There, her temperature registered 104 degrees, and a warrant officer, who was a physician's assist-

ant, diagnosed Jennifer's condition as an upper respiratory infection. He gave her tylenol to reduce the fever and sent her home. Jennifer's condition did not improve, and on June 28, 1977, Dr. Krenytzky examined her at the Naval Hospital. He diagnosed her condition as a severe ear infection and prescribed ampicillin and actifed. It is disputed whether the Crandells informed the warrant officer or Dr. Krenytzky about Jennifer's seizure. Jennifer's condition deteriorated, and on July 1, 1977, Dr. Hammer examined her at the Naval Hospital; he immediately noted symptoms of meningitis. Dr. Hammer, attempting no treatment, sent her to Walter Reed Hospital, where doctors diagnosed her condition as meningitis. Jennifer presently suffers from severe sequelae, including severe retardation.

The principal issue at trial was whether the medical personnel at Quantico Hospital breached the applicable medical standards of care in failing to timely diagnose and treat meningitis. Assuming a breach, there was also a serious question of causation— whether Jennifer's permanent injuries were a proximate result of the negligence.

■ The Crandells on appeal challenge the trial court's findings on the substantive medical malpractice issues, and contend that the trial judge's conduct deprived them of a fair trial. We agree with the latter contention, and reverse and remand for a new trial.

The Crandells essentially argue that the trial judge decided this case before hearing all of the evidence and adhered to that prejudgment throughout the trial. They contend that this is evident from the judge's numerous improper interjections during the trial and his preclusion of plaintiffs from adequately presenting their case. As evidence of his prejudgment, the Crandells point specifically to the judge's remarks concerning (a) their refusal to settle and (b) financial considerations extraneous to the issues. They further point to (c) the judge's badgering of their expert witnesses and (d) his interference with the Crandells' counsel's attempts to cross-examine the key defense witness, as demonstrations of the judge's determination to prevent them from developing their evidence.

Public policy, of course, favors private settlement of disputes. A trial judge if possible should assist parties in their attempts at settlement, even to the point of encouraging them. As with his trial conduct, however, the judge's actions must be perceived as just and impartial. There is necessarily a broad line between commendable advancement of judicial economy and undue court meddling. The trial judge in this case suggested during a bench trial that plaintiffs unreasonably refused to settle their suit.[1] The comments were disparaging, indicating possible judicial prejudice against plaintiffs' case. The judge's comments were improper and certainly were not in the tradition of a fair, impartial presiding judge assisting both parties to reach a just private settlement.

Prejudgment is further indicated by judicial comments about the possible financial ramifications of the trial—considerations which were irrelevant to proper deliberation of the issues. The judge indicated his concern about the effect of a verdict in favor of plaintiffs on the cost of medical malpractice insurance.[2] On another occasion, he commented that "taxpayers" might

---

1.    THE COURT: All right.
   Why don't you settle if there's no contest. It would save a lot of trouble.
      MR. SNEAD: You try to persuade the Government they should.
      THE COURT: Do you hope to settle this case or do you want such a substantial amount that it is not settleable? It's a simple question. I know you're talking millions.
      MR. SNEAD: Your Honor, that is not so.
      THE COURT: What are you talking about? How much will you take in cold dollars?

      MR. SNEAD: Your Honor, I would have to tell the finder of fact in this case that negotiations are probably inappropriate.
      THE COURT: I can tell you some judges that would tell you to settle a case, and I've never done that yet, but I can name you several judges that have done that and been upheld in it.
      Anyway, it is so obvious, I think the case ought to be settled. The Government says the same thing, but you won't listen to any reasonable degree of settlement.

2.    MR. SNEAD: I contend there was negli-

be the ones to pay damages if the United States was found liable.[3] The trial judge, with possible pejorative connotations, also remarked that the Crandells received free medical care from the Naval Hospital.[4]

The trial judge's interference with the Crandells' expert witnesses is even more clearly a demonstrable error. The judge on one occasion ridiculed one of plaintiffs' experts while contorting his testimony.[5] Although the issues were tried to the judge alone, the possible inhibitive effect on witnesses and counsel presented as much a danger as it would have in a jury trial.[6]

Finally, the trial judge prevented effective cross-examination of the most important defense witness. At the conclusion of the trial, the judge based his opinion almost exclusively on the testimony of the government's expert, Dr. Lehman. All of the findings in the court's memorandum opinion, on the issue of whether the Naval Hospital personnel breached the standard of care and on the issue of medical causation, were lifted virtually verbatim from a report prepared by Dr. Lehman. The court precluded the Crandells' counsel, however, from effectively cross-examining Dr. Lehman on facts in evidence, including the records which Dr. Lehman relied on in forming his opinion.[7] This action by the trial judge was particularly glaring since

gence. I contend there was gross negligence.

THE COURT: When the child was first brought in with a cold? Well, then every doctor better up his malpractice insurance.

Under that ruling, if I were a doctor, every six-month old baby that came to me, I would do a spinal tap on every one of them. I'm serious.

. . . .

I can see that medical malpractice insurance if every time you've got a cold you tap to see if they have spinal meningitis.

3. THE COURT: I'm looking at it objectively. I agree that this child has permanent residual. The question is whether the taxpayers should pay for it.

This is a case where the taxpayer would pay . . . .

4. THE COURT: . . . this mother had a six-month old baby that she was staying home with at that time. She was awakened one morning by coughing and what have you and so forth and Mr. Young said, "You better bring the child to the clinic," which is normal, particularly if you've got free service, and they did take him [sic] over.

5. THE COURT: This doctor says it was, there was growth deficiency prior to the meningitis, isn't that what you just said?

THE WITNESS: No. He is saying that from a review of the history—

THE COURT: (Interposing) Certainly, you couldn't exist without history, could you, Doctor?

THE WITNESS: No.

THE COURT: Well, I didn't think you could. You couldn't diagnose any thyroid without having a very complete history.

THE WITNESS: We could, yes.

THE COURT: You could? Could you tell me now if I have got a headache, Doctor?

THE WITNESS: A headache is a symptom not a disease.

THE COURT: Could you tell me whether I have a thyroid deficiency without asking questions—my, my, my, Doctor, you are the first doctor in all my 80 years that ever told me substantive symptoms, which is history, didn't mean a thing to you.

MR. SNEAD: He didn't say that.

THE WITNESS: I didn't say that.

THE COURT: I know what he said. I know what he means. He said he didn't need the history.

THE WITNESS: To make a diagnosis of hypothyroidism in an infant.

THE COURT: That's what he said. He didn't need the history.

THE WITNESS: Yes, sir. I can explain why.

THE COURT: Well, that's your opinion.

MR. SNEAD: Could he explain it?

THE COURT: Let him explain it. I don't want you to testify. You brought him over here as an expert.

THE WITNESS: You can make the diagnosis of hypothyroidism in an infant because they are now screened and we get a laboratory test. In addition, where a child comes in untreated there are certain physical findings you can see that you do not need a history for, and I can list a large number of diseases that can make the diagnosis, I can make the diagnosis by merely looking at the patient without a word being uttered because it is so characteristic.

THE COURT: Well, I am sure if I had my right arm cut off you can tell me I am missing my right arm. I am conscious of that.

6. *See Pollard v. Fennell,* 400 F.2d 421, 425 (4th Cir.1968).

7. Q. You don't know, then—you don't have an opinion for this Court about—

A. (Interposing) Not without being given information that is reliable on what happened between the 28th and the 1st, no.

the defendant's counsel never objected to the form or appropriateness of the questions—the court simply assumed the role of an advocate.

The trial court also, again *sua sponte,* prevented the Crandells' counsel from exploring Dr. Lehman's change of opinion on the causation issue. Dr. Lehman in his deposition and pretrial report stated unequivocally that hypothyroidism overwhelmingly caused Jennifer's permanent injuries, discounting the meningitis almost entirely as a contributing factor. Dr. Lehman testified at trial, however, that it was impossible to isolate the damages attributable to meningitis from those allegedly caused by hypothyroidism.[8]

It is true that a trial judge functions not merely as an umpire, but as a governor to see that justice is done. *Pollard v. Fennell,* 400 F.2d 421, 423–24 (4th Cir.1968). The judge, for example, is entitled to propound questions pertinent to a factual issue which requires clarification.

> Q. All you know is it happened sometime—
> THE COURT: (Interposing) He says he doesn't even know it happened.
> MR. SNEAD: If it happened.
> BY MR. SNEAD:
> Q. Doctor, let's assume that this child did develop, sometime between the 28th and the 1st, a very fulminating viral bacterial meningitis. And further assume that there were frank indications of this on the 1st, that there was a bulging fontanelle, that the left eye was turned inward—
> THE COURT: (Interposing) Doctor, you are not assuming that, are you, in your findings?
> THE WITNESS: I am listening to him. These are not my assumptions at the moment.
> MR. SNEAD: Your Honor, it's in evidence.
> THE COURT: What's in evidence?
> MR. SNEAD: The fact that the child—
> THE COURT: (Interposing) But he doesn't accept it. Next question. He doesn't have to accept everything you say.
> MR. SNEAD: He certainly doesn't, and I don't expect him to. But I would expect him to accept the facts in evidence.
> THE COURT: You are not the judge of the sole facts in evidence. Next question.
> If you have something in the record, pick it out of the record. You can show it to him. Ask him how he reconciles his opinion with this exhibit.
> MR. SNEAD: I'm trying to understand—this Court asked this witness about his feelings about the adequacy of the care of the infant on the 1st of July.
> THE COURT: Based solely, nothing hypothetical, based solely upon what he discovered from these records that he looked at.
> MR. SNEAD: Yes.
> THE COURT: I didn't ask him to make any hypotheses, period.
> BY MR. SNEAD:
> Q. If I told you that the evidence in this case is that there was a significant neurological sign, the left eye was turned inward—

> THE COURT: (Interposing) Next question. I'm not going to let him with this. We will be here the rest of the night.
> MR. SNEAD: Your Honor, I believe that is material to the—
> THE COURT: (Interposing) Well, I'm sorry.
> MR. SNEAD: It's material to the material the gentleman reviewed.
> THE COURT: I'm not going to let you—you asked eleven hypotheses and hypotheticals, but I really want to find out what the facts are and not hypotheses.

8.
> BY MR. SNEAD:
> Q. You were asked in your deposition, Doctor, about whether the neurological impairment from which this child suffered resulted primarily from hypothyroidism.
> A. That is hypo, not hyper.
> Q. And your answer was, yes, that it did.
> A. I think it's a major contributing factor.
> Q. And you were asked—you would base that opinion with a reasonable degree of medical probability and certainty?
> A. That's correct.
> Q. Is that your opinion?
> A. My opinion at this point in time, having reviewed the literature as carefully and extensively as I can, is that there is no way to clearly separate out which parts of it were due to which.
> Q. And you are changing your opinion somewhat?
> THE COURT: Next question.
> BY MR. SNEAD:
> Q. Answer.
> A. Yes.
> THE COURT: I will be the one to decide whether he changes it or not. And I will enlighten you. Everybody has a right to change their opinion with new evidence, new studies.
> MR. SNEAD: Yes, sir.
> BY MR. SNEAD:
> Q. Was there any new study done?
> THE COURT: Let's get on with it, Mr. Snead. I have given you a long time. If you have any further questions, I will let you ask them.

He may intercede because of apparent inadequacy of examination or cross-examination by counsel, or to draw more information from relevant witnesses or experts who are inarticulate or less than candid. *United States v. Cassiagnol,* 420 F.2d 868, 879 (4th Cir.), *cert. denied,* 397 U.S. 1044, 90 S.Ct. 1364, 25 L.Ed.2d 654 (1970). This privilege or duty, however, is subject to reasonable limitations.

■ A trial judge must assiduously perform his function as governor of the trial dispassionately, fairly, and impartially. *Pollard v. Fennell,* 400 F.2d at 424. He must not predetermine a case, and we must condemn any conduct before or during the course of a trial which indicates predisposition. *United States v. Cassiagnol,* 420 F.2d at 878. It is important that a litigant not only actually receive justice, but that he believe that he has received justice. *Pfizer Inc. v. Lord,* 456 F.2d 532, 544 (8th Cir. 1972).

We have in recent years more than once reversed a decision of a district court due to improper conduct by the trial judge. In *Pollard v. Fennell,* 400 F.2d 421 (4th Cir. 1968), a civil case tried before a jury, we reversed the judgment because of the district judge's "improper and unwarranted participation in the trial." *Id.* at 422–23. We said:

> On this record we regret that the district judge fell short of the required standard. By acting, not as a disinterested prober for the truth, but as an advocate and, in addition, by acting as a witness, he created a record from which we must infer that defendants and the jury, with justification, concluded that he unduly favored plaintiff over defendants in regard to the point in issue.

*Id.* at 424.

*United States v. Cassiagnol,* 420 F.2d 868 (4th Cir.1970), involved several criminal cases which were consolidated for appeal. We reversed the convictions of two of the defendants, one convicted after a bench trial and the other after a jury trial, due to the trial judge's improper conduct. During the nonjury trial of the first defendant, the judge exhaustively interrogated, lectured and chided the defendant while he was testifying. We reversed because the trial judge's comments indicated that he had predetermined the defendant's guilt before the case was fully presented. *Id.* at 878. Throughout the jury trial of the second defendant, the judge questioned the defendant in a hostile manner, often indicating that he was seeking specific answers. He repeatedly interrupted defense counsel with sharp, critical comments. We reversed because the judge's conduct prejudiced the defendant before the jury and deprived her of a fair trial. *Id.* at 879.

An impartial observer could well conclude from the record in the case *sub judice* that the trial judge predetermined the outcome before the Crandells fully presented their case. The record reveals numerous judicial interjections indicating hostility toward the plaintiffs and their experts, and also reveals an over-solicitous acceptance of the testimony of defendant's expert. The trial judge precluded plaintiffs from developing important evidence at trial. Some of the judge's remarks could only lead an impartial observer to conclude that his decision was influenced by concerns irrelevant to the issues—the price of malpractice insurance and that "taxpayers" may ultimately bear the burden of paying any damages. No litigant can rightfully expect a favored status before a judge or jury, but all must be assured that their cause will be presented, reviewed, and judged impartially and fairly. We are cautious not to fetter unduly the necessary governing function of trial court judges, but the conduct of the judge in the present case again fell far short of the standards requiring him to govern the trial dispassionately. We do not express any opinion on the substantive merits of the malpractice claim, but we conclude that the trial judge's conduct deprived the Crandells of a fair trial. We, therefore, reverse the judgment of the district court and remand with instructions to the Chief Judge of the Eastern District of Virginia to reassign the case to a different trial judge.

REVERSED AND REMANDED.