**D. Lamar DELOACH, William G. Hyman, Hyman Farms, Inc., Guy W. Hale, James R. Smith, Houston T. Everett, D. Keith Parrish, Plaintiffs,**

v.

**PHILIP MORRIS COMPANIES, INCORPORATED, Philip Morris USA Inc., Philip Morris International, Inc., R.J.R. Nabisco Holdings Corp., R.J. Reynolds Tobacco Holdings, Inc., R.J. Reynolds Tobacco Company, B.A.T. Industries, P.L.C., British American Tobacco Company, Inc., Batus Holdings Incorporated, Brown & Williamson Tobacco Corporation, Lorillard Tobacco Company, Loews Corporation, Universal Leaf Tobacco Co., J.P. Taylor Co., Inc., Southwestern Tobacco Co., Inc., Dimon Inc., Standard Commercial Corp., Defendants.**

No. 1:00 CV 01235.

United States District Court, M.D. North Carolina.

June 4, 2004.

Alan M. Wiseman, Joseph A. Ostoyich, Robert F. Ruyak, Kenneth C. Anderson, Robert L. Green, Jr., Thomas A. Isaacson, Jason D. Smith, Christina G. Sarchio, Howrey Simon Arnold & White, LLP, Alexander J. Pires, Jr., Conlon Frantz Phe-

lan & Pires, LLP, Washington, DC, James H. Hughes, Hutson Hughes & Powell, Richard M. Hutson, II, Durham, NC, J. L. Chestnut, Chestnut Sanders Sanders & Pettaway, P.C., Selma, AL, for Plaintiffs.

Douglas L. Wald, Daniel R. Waldman, Donna E. Patterson, Robert J. Jones, Mark R. Merley, Anthony J. Franze, Michael D. Yeh, Mark J. Montano, Sarah B. Kotler, Arnold & Porter, Donald L. Flexner, Amy J. Mauser, Boies Schiller & Flexner, Paul A. Kaplan, Womble Carlyle Sandridge & Rice, PLLC, Kenneth N. Bass, Kirkland & Ellis, Peter J. Kadzik, R. Bruce Holcomb, Barry J. Fleishman, James Van R. Springer, Dickstein Shapiro Morin & Oshinsky, LLP, Washington, DC, Angela L. Little, Smith Helms Mulliss & Moore, LLP, Gregory Gerald Holland, Dixie Thomas Wells, Smith Moore, L.L.P., James T. Williams, Jr., Jennifer Van Zant, Brooks Pierce McLendon Humphrey & Leonard, Greensboro, NC, David Boies, Boies Schiller & Flexner, LLP, Armonk, NY, James Donald Cowan, Jr., Lisa Frye Garrison, Smith Moore, L.L.P., Robert Harrison Sasser, III, Gwenda Lee Laws, Kurt Douglas Weaver, Womble Carlyle Sandridge & Rice, Raleigh, NC, James H. Hughes, Hutson Hughes & Powell, Jeffrey B. Welty, Durham, NC, W. Andrew Copenhaver, Hada V. Haulsee, Womble Carlyle Sandridge & Rice, William Kearns Davis, James R. Fox, Stephen McDaniel Russell, Troy Douglas Cahill, Bell Davis & Pitt, P.A., Winston–Salem, NC, Stephen R. Patton, Jeffrey L. Williams, Jeffrey L. Willian, Kirkland & Ellis, Chicago, IL, Irving Scher, August T. Horvath, Weil Gotshal & Manges, LLP, New York, NY, Harold H. Chen, Orange, CT, Samuel T. Currin, Currin Law Firm, PLLC, Wade Marvin Smith, Tharrington Smith, Douglas W. Kenyon, Hunton & Williams, David William Long, Poyner & Spruill, L.L.P., Joseph E. Zeszotarski, Jr., Raleigh, NC, R. Noel Clinard, Hunton & Williams, Richmond, VA, for Defendants.

## MEMORANDUM OPINION AND ORDER

OSTEEN, District Judge.

On April 22, 2004, this court granted preliminary approval to a settlement between Plaintiff Class and R.J. Reynolds Tobacco Co. ("Reynolds"). Prior to the approval of this settlement (the "Reynolds Settlement"), all of the other Defendants in this case reached a joint settlement with Plaintiffs. Now pending before the court is the motion of Defendant Philip Morris USA Inc. ("Philip Morris") seeking repayment of monies recently paid to Plaintiffs, as well as notices filed by Philip Morris and Lorillard Tobacco Company ("Lorillard"), notifying the court of the triggering of the Most Favored Nations clause of the settlement agreement they entered into with Plaintiffs.

## I. FACTUAL BACKGROUND

On May 16, 2003, the Class and all Defendants except Reynolds entered into a settlement agreement (the "First Settlement Agreement"). The First Settlement Agreement contains two provisions that directly impact any later settlement between the Class and Reynolds: Section 2.1.1 and Section 7. Section 2.1.1 provides that Philip Morris was required to make a "Second Settlement Payment" of $65,000,000 "on the day before the first day of trial against [Reynolds]." (First Settlement Agreement § 2.1.1(B)(i).) The Second Settlement Payment would be modified, however, "[i]n the event that Plaintiffs and the Class reach settlements with [Reynolds] on or before the day before the first day of trial." (Id. § 2.1.1(C).) In that event, the Second Settlement Payment would be reduced by 50 cents for each dollar received from any settlement with Reynolds (exclusive of costs and fees), and the adjusted payment would not be payable until five days after

the final approval of any settlement with Reynolds.

The other provision of the First Settlement Agreement relevant to any future settlements is Section 7, the Most Favored Nations clause. In pertinent part, this section provides that if a settlement is "entered into with [Reynolds] before the beginning of a trial on the merits ... this Agreement will be modified to reduce the green leaf Volume Commitment of Philip Morris USA, Lorillard and B & W." (*Id.* § 7.4.)

The trial between Plaintiffs and Reynolds was scheduled to begin on April 22, 2004. On April 16, 2004, a hearing was scheduled on the parties' pre-trial motions. The court had previously instructed the parties to be prepared to discuss settlement possibilities before being heard on their motions. The parties discussed settlement over the course of the morning of April 16 and that afternoon reported to the court that they had reached agreement on the two central terms of a settlement: a cash payment and a leaf purchase commitment. The court indicated its tentative approval of those two terms. For the first time in the entire litigation, it appeared that settlement between Plaintiffs and Reynolds was a possibility. However, the court directed that the trial would remain set as scheduled.

On April 22, at 9:00 a.m., the time scheduled to begin jury selection, court was convened and Plaintiffs' counsel announced that a settlement had been reached and moved for its preliminary approval. The court dismissed the jury panel that had been assembled and granted its preliminary approval to the settlement. A hearing was scheduled for Friday, April 30, 2004 (later rescheduled for Monday, May 3, 2004), for the court to review the plan of notice proposed by the parties for informing the Class of the Reynolds Settlement. Prior to this hearing, Philip Morris and Lorillard filed the motion and notices that are presently under consideration. At the May 3 hearing, the parties were heard on those filings rather than the proposed notice.

## II. DISCUSSION

### A. The Section 2 Dispute

As noted above, Section 2.1.1 of the First Settlement Agreement allows Philip Morris to reduce the amount of its Second Settlement Payment "[i]n the event that Plaintiffs and the Class reach settlements with [Reynolds] on or before the day before the first day of trial against [Reynolds]." (First Settlement Agreement § 2.1.1(C).) Philip Morris argues that the settlement between Plaintiffs and Reynolds was reached on April 16, or at least by April 21 (the day before the first scheduled trial day) and as such Section 2.1.1(C) has been triggered. Besides seeking a reduction in the amount of the Second Settlement Payment, Philip Morris also asks the court to order that its payment (made April 21) be returned to it until five days after the Reynolds Settlement is finally approved. (*See id.* § 2.1.1(B)(ii).) In the alternative, Philip Morris asks the court to permit discovery on the issue of when a settlement was actually reached.

Philip Morris points to *Smith v. Columbia Gas Transmission Corp.*, in which the Fourth Circuit affirmed a district court's decision to enforce a settlement agreement that had been orally agreed to, but which the plaintiff ultimately refused to sign. No. 97–2786, 1999 WL 198799, at *1–4 (4th Cir. Apr.9, 1999). Citing this precedent, Philip Morris argues that the Reynolds Settlement was "reached" and enforceable by at least April 21 even without the formal signing of the agreement that occurred on April 22.

Philip Morris is correct when it asserts that the essential terms of the settlement

were agreed to on April 16. By that afternoon, counsel for Reynolds and the Class had informed the court that an agreement had been reached whereby Reynolds would pay $33 million in cash and purchase 35 million pounds of domestic leaf for each of the next ten years. At that time, counsel indicated, however, that some details remained to be worked out and that in any event, no final agreement would be entered into before April 22.

■ Despite the Fourth Circuit's holding in *Smith*, there is no reason to conclude that a binding settlement was reached in this case before April 22. In determining the binding nature of a settlement agreement, a court should consider "whether the agreement at issue is the type of contract that is usually put in writing." *Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 326 (2d Cir. 1997). The magnitude of this settlement is such that the sophisticated parties involved would never have reached final agreement without a signed writing. *See, e.g., Peterson v. Atlantic Funding Corp.*, No. 97–1680, 1998 WL 390842, at *2 (4th Cir. June 29, 1998) (noting that in an agreement of sufficient size and complexity, the parties clearly contemplate reducing the agreement to a final writing); *Peterson v. Cooley*, 142 F.3d 181, 186 (4th Cir.1998) (noting that "a transaction of this size and complexity [over $4 million] is normally embodied in a written contract"); *Davidson Pipe Co. v. Laventhol & Horwath*, No. 84 Civ. 5192, 1986 WL 2201, at **4, 8 (S.D.N.Y. Feb.11, 1986) (holding that, where an agreement included "numerous complex terms," "the parties did not intend to be contractually bound by anything other than a final written agreement"). The court concludes for this reason that the agreement reached on April 16 was not sufficiently final to have constituted a "settlement" for purposes of Section 2.1.1.

Between April 16 and April 22 various drafts of the Reynolds Settlement undoubtedly passed between counsel. Even as the agreement was becoming more firm, however, the court cannot conclude that a "settlement" as contemplated by Section 2.1.1 occurred before April 22. The terms of the Reynolds Settlement make clear that the earliest any "settlement" might have occurred was April 22. Moreover, that document provides repeated indications that the parties did not intend to bind themselves prior to April 22. First, the Reynolds Settlement recites that it was "entered into" on April 22. Moreover, the effective date of the agreement is specifically defined as the date on which counsel signed the agreement. (Reynolds Settlement § 1.5.) The effective date of the agreement (i.e., the date of signing) triggers Class Counsel's obligation to seek preliminary approval of the agreement. (*Id.* § 10.2.) That the parties have expressly defined the effective date and tied certain responsibilities to that date directs the court to give substantial weight to that date as the true date of the settlement. *See Ciaramella*, 131 F.3d at 324; *Davidson Pipe*, 1986 WL 2201, at *4.

The Reynolds Settlement also forecloses the possibility that any binding agreement was entered into before its effective date. First, after numerous recitals, the Reynolds Settlement begins the agreement with the language "NOW, THEREFORE," indicating a present agreement, not a pre-existing one. *See Ciaramella*, 131 F.3d at 324. Moreover, the agreement contains a merger clause which specifies that the signed agreement "supersedes any and all prior communications, negotiations and agreements" between the parties. (Reynolds Settlement § 11.1.) The presence of such language "is persuasive evidence that the parties did not intend to be bound prior to the execution of a written agreement." *Ciaramella*, 131 F.3d at 324; *ac-*

cord *Davidson Pipe*, 1986 WL 2201, at *5; *see also Zinn v. Walker*, 87 N.C.App. 325, 333, 361 S.E.2d 314, 318 (1987) ("North Carolina recognizes the validity of merger clauses and has consistently upheld them.").

Due to the complexity of the Reynolds Settlement and the language of the agreement itself, the court concludes that the earliest the settlement was reached was April 22, 2004, the date on which it was signed. This date being after the day before the first day of trial, Reynolds is not entitled to a reduction of its Second Settlement Payment. As such, Philip Morris's motion for return of the Second Settlement Payment and for discovery will be denied.

### B. The Section 7 Dispute

■ Section 7 of the First Settlement Agreement operates to allow Lorillard and Philip Morris to reduce their leaf purchase commitment if Reynolds settles on better terms than they received. Both Lorillard and Philip Morris have notified the court that they believe Section 7 is triggered by the Reynolds Settlement.

Section 7 was agreed to "[i]n recognition of, among other things, Philip Morris USA's, Lorillard's, and B & W's role as the first defendants to settle and their lead roles in initiating and pursuing settlement." (First Settlement Agreement § 7.1.) Counsel for both Philip Morris and Lorillard indicated at the May 3 hearing that Section 7 was essential to their agreeing to the First Settlement Agreement, as it was designed to protect them from a competitive disadvantage relative to Reynolds.

By its terms, Section 7 "applies only to settlements entered before the beginning of trial, but not to any settlements entered thereafter." (*Id.* § 7.1.) As established above, the earliest the Reynolds Settlement was entered into was April 22, 2004, the day on which trial was to begin. The question remains, however, whether the settlement signed just as court was to open that morning was "entered before the beginning of trial."

■ In interpreting contracts, North Carolina courts[1] first look to the plain language of the contract itself. *See, e.g., Walton v. City of Raleigh*, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996) ("If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract."). "Ordinary words" in a contract must be given their "ordinary meaning unless it is apparent that the words were used in a special sense." *Harris v. Latta*, 298 N.C. 555, 558, 259 S.E.2d 239, 241 (1979); *accord County of Moore v. Humane Soc'y of Moore County*, 157 N.C.App. 293, 298, 578 S.E.2d 682, 685 (2003). Section 7 is clear that it "applies only to settlements entered before the beginning of trial, but not to any settlements entered thereafter." (First Settlement Agreement § 7.1.) The task for the court is thus to find the "ordinary meaning" of the phrase "before the beginning of trial."

In the criminal context, a bright line is used to define the beginning of the trial for double jeopardy purposes. Jeopardy attaches when a defendant is "put to trial before the trier of facts." *Serfass v. United States*, 420 U.S. 377, 388, 95 S.Ct. 1055, 1062, 43 L.Ed.2d 265 (1975) (quoting *United States v. Jorn*, 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971)). In a jury trial, a defendant is "put to trial" when the jury is impaneled and sworn. *Id.; United States v. Shafer*, 987 F.2d

---

1. The First Settlement Agreement is governed by the law of North Carolina. (First Settle- ment Agreement § 11.1.)

1054, 1057 (4th Cir.1993). On the other hand, for purposes of the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.*, trial has been held to begin when jury selection begins. *See, e.g., United States v. Mentz,* 840 F.2d 315, 326 n. 21 (6th Cir.1988); *United States v. A–A–A Elec. Co.,* 788 F.2d 242, 246 (4th Cir.1986); *United States v. Manfredi,* 722 F.2d 519, 524 (9th Cir. 1983).

The question of when a civil trial begins, however, is less clear. *See Pratt v. Bishop,* 257 N.C. 486, 504, 126 S.E.2d 597, 610 (1962) ("When a trial commences is a difficult question . . . ."). Indeed, the time of commencement of a trial may vary from case to case "according to the circumstances in a particular case." *Id.* For example, in *Pratt v. Bishop,* the North Carolina Supreme Court construed a statute requiring an objection to deposition testimony to be filed "[a]t any time before trial." *Id.* (quoting N.C. Gen.Stat. § 8–81). Although the court cited a general rule that "trial begins when the jury are called into the box for examination as to their qualifications," it could not tell from the record when Bishop's motion had been filed, only that it occurred on the day trial was scheduled and before the jury was impaneled. *Id.* (quoting 53 Am.Jur. Trial § 4). The court concluded that the purpose of the statute would not be served by holding that the jury must be impaneled for trial to begin; rather it was enough that the "case is reached on the calendar and the jury called into the box." *Id.*

The court in *Greenwood v. Stevenson* was similarly flexible. 88 F.R.D. 225 (D.R.I.1980). The issue in that case was whether an offer of judgment pursuant to Rule 68 of the Federal Rules of Civil Procedure was made "more than 10 days before the trial begins." Fed.R.Civ.P. 68; *see Greenwood,* 88 F.R.D. at 227–29. Jury selection had occurred in April although the trial was not scheduled to begin until June 1. *Greenwood,* 88 F.R.D. at 226. On May 21, the defendants made an offer of judgment pursuant to Rule 68. *Id.* When the defendants later sought to escape the offer, one of their arguments was that it was untimely filed, having come more than 50 days after jury selection. *Id.* at 227. The court considered the policy underlying Rule 68 and noted that there was nothing "mystical about the process of jury selection such that impaneling inherently and necessarily marks the beginning of trial." *Id.* Ultimately, the court concluded that finding that trial began not with the impaneling of the jury, but with the beginning of the evidence best served the policy underlying the rule. *Id.* at 229. These cases and others [2] suggest that, in a civil case, courts are flexible in determining when a trial begins, and may decide it began before a jury was selected.

On the other hand, Philip Morris and Lorillard cite civil cases that are more decided in their definition of the beginning of trial. In many instances, jury selection

**2.** For example, in *Scofield v. Scofield,* the Supreme Court of Colorado refused to find that trial had not begun for purposes of a statute allowing a plaintiff to dismiss his case before trial. 89 Colo. 409, 3 P.2d 794, 796 (1931). The trial court had considered pretrial motions, scheduled two days for trial, and convened court with the parties present, "presumably for nothing but trial." *Id.* The court concluded that it could not "be said under such circumstances that the trial was not in progress." *Id.* In *Fleming v. Fire Ass'n*

*of Philadelphia,* the Georgia Supreme Court held that it was error for a trial judge to allow removal of a case to federal court once the trial began. 76 Ga. 678, 1886 WL 1362, at *3 (Ga.1886). The removal statute required that motions for removal be made before trial began, and the court concluded that such a motion was untimely where the case was called for trial, preliminary motions had been heard, and the parties were instructed to "strike the jury." *Id.* at *2.

is considered to be a part of the trial. *See, e.g., Coachella Valley County Water Dist. v. Dreyfuss,* 91 Cal.App.3d 949, 154 Cal. Rptr. 467, 471 (1979) ("[T]rial commences with the examination of prospective jurors."); *Wilhite v. Agbayani,* 2 Ill.App.2d 29, 118 N.E.2d 440, 442 (1954) (concluding that there was "no doubt that the trial had begun" when the jury had been selected and sworn); *see also Pfleeger v. Swanson,* 229 Or. 254, 367 P.2d 406, 408 (1961) (holding that while jury selection is part of the trial, it is not part of the "trial of the facts" as used in the relevant Oregon statute). Indeed, Philip Morris and Lorillard also cite the *Pratt* case, on which Plaintiffs heavily rely, for its proposition that "trial begins when the jury are called into the box for examination as to their qualifications." 257 N.C. at 504, 126 S.E.2d at 610. Other cases use an even later time to mark the start of trial, such as the time when evidence is first presented. *See, e.g., Wilkins v. Gagliardi,* 219 Mich.App. 260, 556 N.W.2d 171, 179 (1996) (holding that trial began when the court began to hear arguments and evidence); *Schwartz v. Estate of Greenspun,* 110 Nev. 1042, 881 P.2d 638, 641–42 (1994) (holding that, for purposes of Nevada Rule of Civil Procedure 68, trial begins when evidence is presented, while noting that in other situations trial begins when the jury panel is examined); *see also Abbiati v. Buttura & Sons, Inc.,* 161 Vt. 314, 639 A.2d 988, 994–95 (1994) (holding timely an offer of judgment made six days before trial was scheduled to start, where trial actually started a month later, since rule referred to when trial began, not when it would have begun).

Philip Morris and Lorillard look to these cases and argue that trial begins at the earliest when jury selection begins, and frequently later. They further argue that no event in this case indicates that trial had started under any definition. The court reads these cases, however, to demonstrate quite a bit of variance in ascertaining the start of a trial. *See, e.g., Schwartz,* 881 P.2d at 641–42 (noting the three different times when a trial can be said to have begun in various situations in Nevada); *see also United States v. Montoya,* 827 F.2d 143, 150 (7th Cir.1987) (holding that plea negotiations in an unrelated prosecution were part of the "trial" of that prosecution such that the time was excluded from counting under the Speedy Trial Act, 18 U.S.C. § 3161(h)(1)(D)). It would seem that, as the *Pratt* court noted, the time when trial begins can vary "according to the circumstances in a particular case." 257 N.C. at 504, 126 S.E.2d at 610.

■ When, as here, the words used in a contract are susceptible to more than one meaning, the court must give the words the meaning the parties intended them to have. *Peaseley v. Virginia Iron, Coal & Coke Co.,* 282 N.C. 585, 601, 194 S.E.2d 133, 145 (1973). Indeed, the intent of the parties has been called "[t]he heart of a contract." *Adder v. Holman & Moody, Inc.,* 288 N.C. 484, 492, 219 S.E.2d 190, 196 (1975). To ascertain the parties' intent, courts look to the language of the contract, its purposes and subject matter, and the parties' situation at the time of agreement. *See id.*

The apparent intent of the language limiting the operation of Section 7 is to limit the temporal scope of the Most Favored Nations ("MFN") clause. Because MFN clauses can hinder later settlements, courts frequently ensure that such clauses have time limits before approving them. *See, e.g., Cintech Indus. Coatings, Inc. v. Bennett Indus., Inc.,* 85 F.3d 1198, 1203 (6th Cir.1996) (noting the "disfavored status" of MFN clauses especially in complex litigation like antitrust class actions because they "often inhibit compromise and settlement," but ultimately affirming an order that such a clause had not been triggered); *In re Brand Name Prescription Drugs Antitrust Litig.,* No. 94 C 897,

1996 WL 351180, at *2 (N.D.Ill. June 24, 1996) ("[W]e find it significant that any obligations created by the present [MFN clause] terminate absolutely within a finite period."); Manual for Complex Litigation (Fourth) § 13.23 (2004) (noting the drawbacks of MFN clauses, and suggesting that they should terminate after a specified time period).

Knowing that the parties' intent was to ensure a time limit on the effectiveness of the MFN clause does not, however, help to answer the question of precisely what time was meant to be the cutoff point. One might suggest that more definite language might have been preferable, though the parties acknowledge in the First Settlement Agreement that each side had the opportunity to review and revise the agreement, and that ambiguities should not be construed against either side as the "drafter." (*See* First Settlement Agreement § 11.4.) Plaintiffs turn to public policy to suggest that the construction given to the MFN clause in this case should be one that promotes settlement and narrowly construes the MFN clause due to its potentially disastrous consequences for the Class.[3] *See, e.g., Crandell v. United States,* 703 F.2d 74, 75 (4th Cir.1983) ("Public policy, of course, favors private settlement of disputes."); *Rowe v. Rowe,* 305 N.C. 177, 186, 287 S.E.2d 840, 846 (1982) (noting North Carolina's "sound public policy encouraging the settlement of disputes out of court"); Manual for Complex Litigation § 13.23 ("The judge may have to consider voiding or limiting [MFN clauses] if enforcement becomes inequitable."). In response to Plaintiffs' policy

argument, Philip Morris and Lorillard argue that public policy in fact favors freedom of contract, ensuring that parties receive the benefits of their validly-enacted agreements. *See St. Paul Mercury Ins. Co. v. Duke Univ.,* 849 F.2d 133, 135 (4th Cir.1988) ("Were courts free to refuse to enforce contracts as written on the basis of their own conceptions of the public good, the parties to contracts would be left to guess at the content of their bargains, and the stability of commercial relations would be jeopardized."). Philip Morris and Lorillard further argue that public policy exceptions to contract enforcement should only sparingly be granted. *See Twin City Pipe Line Co. v. Harding Glass Co.,* 283 U.S. 353, 356–57, 51 S.Ct. 476, 477, 75 L.Ed. 1112 (1931) (stating that refusing to enforce contracts for contravention of public policy should be done "with caution" and "only in cases plainly within the reasons on which that doctrine rests").

Philip Morris and Lorillard point to *St. Paul Mercury Insurance Co. v. Duke University* as particularly instructive. In that case, the Fourth Circuit reversed a district court's decision refusing to enforce a contract where there was no clear North Carolina policy violated by its enforcement. *St. Paul Mercury,* 849 F.2d at 137. The court admonished that refusal to enforce a contract should be "limited to occasions where the contract would violate 'some explicit public policy' that is 'well defined and dominant, and [which] is to be ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests." ' " *Id.* at 135 (quoting *United Paperworkers*

---

**3.** Although Plaintiffs dispute Philip Morris's calculations, Philip Morris has argued that if the MFN clause is triggered, their leaf commitment would be reduced by 68.8%, from 330 million pounds per year to roughly 103 million pounds per year. The loss of nearly 230 million pounds in leaf purchase commitments is not nearly ameliorated by the Reyn-

olds Settlement, in which Reynolds agrees to buy 35 million pounds per year. For purposes of the present dispute, the court need not determine whether Philip Morris's calculations are correct, but they are relevant to show the staggering impact the operation of the MFN clause may have on the Class.

*Int'l Union v. Misco, Inc.*, 484 U.S. 29, 43, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1987)). Since the North Carolina Supreme Court had reserved, but not ruled on, the issue in *St. Paul Mercury*, it was not proper for the district court to presume that North Carolina policy would bar enforcement of the contract. *Id.* at 136. In the only North Carolina case addressing MFN clauses, the North Carolina Supreme Court declined to declare such a clause void as against public policy. *State ex rel. Utils. Comm'n v. Eddleman*, 320 N.C. 344, 377, 358 S.E.2d 339, 360 (1987). Following *St. Paul Mercury*, Philip Morris and Lorillard ask this court not to strike down the MFN clause as violative of public policy.

■ The court is not inclined to strike the MFN clause in its entirety, as it is clear that MFN clauses are generally enforceable, provided they have appropriate limits on their operation. *See* Manual for Complex Litigation § 13.23. The ultimate question in this case is not whether the MFN clause should be enforced, but the meaning of the parties' limit on the MFN clause. The question the court must answer is whether the parties intended the "beginning of trial" to have a precise meaning, such as when the jury was sworn, or whether they intended it to be a more general meaning referring to the period between the First Settlement and the start date of the trial. The policy favoring settlement of cases, in combination with the policy disfavoring the inequitable interpretation of MFN clauses, suggests that the proper construction of the MFN clause in this case is that a settlement entered into on the day trial was scheduled to start, at the time the case was called for trial, with a jury venire present, was not entered into before the beginning of trial. Under this construction, the court concludes that the Reynolds Settlement does not trigger the MFN clause and Philip Morris and Lorillard are not entitled to a reduction in their leaf commitments under Section 7 of the First Settlement Agreement.[4]

**4.** If Philip Morris and Lorillard's interpretation of the phrase "beginning of trial" is correct and the MFN clause was triggered by the Reynolds Settlement, the court's path would not be to allow a 68% reduction in the Class's recovery. The court would be compelled to reject the Reynolds Settlement to prevent such an outcome. The court could not in good conscience recommend a settlement to the Class for approval when it would lead to a net loss for Class members. With the Reynolds Settlement rejected, this matter would be reset for trial. Whether a settlement would be reached before that trial or at some point after the trial began would be a matter for the consideration of Plaintiffs and Reynolds.

Philip Morris and Lorillard have suggested that even if the court rejects the settlement, the MFN clause is still triggered and they are still entitled to a reduction in their leaf commitments. The court finds this contention to be inconsistent with the purposes and terms of Section 7. Both Philip Morris and Lorillard highlighted that Section 7 was designed to protect them from competitive disadvantage if Reynolds were to receive a more favorable settlement. If the Reynolds settlement is rejected, however, there is no competitive advantage in Reynolds' favor, and thus no disadvantage faced by Philip Morris and Lorillard. Furthermore, Section 7 is limited by its terms to "settlements entered before the beginning of trial." (First Settlement Agreement § 7.1.) If the Reynolds settlement is rejected, there is no settlement at all, because settlements in class actions must be approved by the court. Fed.R.Civ.P. 23(e). Without such approval, any purported agreement is ineffective. *See, e.g., Duban v. Diversified Mortgage Invs.*, 87 F.R.D. 33, 39–40 (S.D.N.Y.1980) (holding that any releases made in a settlement would be ineffective if the settlement was rejected); *Sagers v. Yellow Freight Sys., Inc.*, 68 F.R.D. 686, 689–90 (N.D.Ga.1975) (vacating a previously approved settlement agreement for failure to comply with the notice requirements of Rule 23(e)); *Banks v. Lockheed–Georgia Co.*, 46 F.R.D. 442, 443 (N.D.Ga.1968) (holding that conciliation agreements entered into outside court supervision do not moot a pending class action claim).

## III. CONCLUSION

For the reasons stated herein,

The court concludes that the settlement entered into between the Class and Reynolds on April 22, 2004, did not trigger the Most Favored Nations provision of the First Settlement Agreement.

IT IS ORDERED that Philip Morris's motion for return of the Second Settlement Payment or for discovery [375] is DENIED.